## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **BANKR. NO. 18-31795** |
| **LYNN KAREN HOCK,** | ) | |
| | ) | **CHAPTER 7** |
| Debtor | ) | |
| _____ | ) | |
| | ) | |
| **LYNN KAREN HOCK,** | ) | |
| | ) | |
| Plaintiff, | ) | **ADV. PRO. NO. 19-03016** |
| | ) | |
| v. | ) | |
| | ) | |
| **DEPARTMENT OF EDUCATION,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MOTION FOR SUMMARY JUDGMENT

Now Comes Defendant, the United States of America, Department of Education ("DOE"), and respectfully moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 and Bankruptcy Rule 7056 as to the claims alleged in Plaintiff's Complaint, and states as follows:

1.     Plaintiff filed an adversary complaint seeking the discharge pursuant to 11 U.S.C.§ 523(a)(8) of the $143,581.48 balance (as of 8/17/20) of her student loan obligations. (Doc. 1).

2.     The summary judgment evidence demonstrates that Plaintiff fails as a matter of law to meet her burden of demonstrating the necessary undue hardship under three-part test set out in *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2d Cir. 1987), and adopted by the Fourth Circuit in *Educ. Credit Mgmt. Corp. v. Frushour* (*In re Frushour*), 433 F.3d 393, 400 (4th Cir. 2005). The grounds supporting this Motion are further set forth in the accompanying memorandum of law and attached exhibits, which are incorporated herein by

reference.

WHEREFORE, the United States requests that the Court grant this motion, enter judgment in favor of the United States against Plaintiff, and enter such other and further relief as necessary.

This 24th day of August, 2020.

Respectfully submitted,

R. ANDREW MURRAY
UNITED STATES ATTORNEY

/s/ Seth Johnson
J. Seth Johnson
NC Bar No. 53217
Assistant United States Attorney
Suite 1650, Carillon Building
227 West Trade Street
Charlotte, North Carolina 28202
Telephone: (704) 338-3159
seth.johnson@usdoj.gov

## CERTIFICATE OF SERVICE

I certify the foregoing Motion, Memorandum of Law, and accompanying exhibits were served on counsel for Plaintiff Karen Lynn Hock, the US Bankruptcy Administrator, and the Chapter 7 Trustee via ECF electronic filing.

/s/ Seth Johnson
Assistant United States Attorney

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **BANKR. NO. 18-31795** |
| **LYNN KAREN HOCK,** | ) | |
| | ) | **CHAPTER 7** |
| Debtor | ) | |
| _____ | ) | |
| | ) | |
| **LYNN KAREN HOCK,** | ) | |
| | ) | |
| Plaintiff, | ) | **ADV. PRO. NO. 19-03016** |
| | ) | |
| v. | ) | |
| | ) | |
| **DEPARTMENT OF EDUCATION,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**</u>

Defendant, the United States of America, Department of Education ("DOE"), respectfully submits this Brief in support of its Motion for Summary Judgment, and would show as follows:

**SUMMARY OF THE ARGUMENT**

Plaintiff Lynn Karen Hock seeks the discharge of the $143,581.48 balance (as of 8/17/20) of her student loans. To do so, she must meet her burden under each of the three independent factors articulated in the "undue hardship" standard set forth in *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2d Cir. 1987), and explicitly adopted by the Fourth Circuit. Specifically, she must establish that: (1) she cannot maintain based on current income and expenses, a minimal standard of living if forced to repay the loan; (2) additional circumstances exist indicating that the state of affairs is likely to persist for a significant portion of the repayment period of the student loan; and (3) she has made good faith efforts to repay the loans. The summary

1

judgment evidence demonstrates that Plaintiff cannot meet the second and third *Brunner* factors as a matter of law.[1]

Rather, Plaintiff—who has only made two payments over the life her loans—has a monthly household income of $6,982.33 and has done little to minimize her expenses: instead, Plaintiff lives with her husband in a four-bedroom house near Lake Norman with a dedicated boat slip, leases two Lexus SUVs, pays her adult son's phone bill, pays for a variety of premium entertainment options, and spends an amount on food per month significantly higher than the national average.

Nor has Plaintiff shown a good faith effort to avail herself of the loan consolidation, income-based repayment, and administrative discharge options available to her. Instead, she has made no effort to consolidate her loans and seek an income-based repayment plan—which currently would drop her monthly payments to **zero**. And despite this case being continued for a year for her to do so, her only effort to seek an administrative discharge based on the health conditions alleged in her Complaint was merely asking one doctor to certify the discharge form in an already-scheduled doctor's visit—with no further effort after that doctor was unwilling to sign the form under penalty of perjury. Taken as a whole, these facts demonstrate that she cannot show a good faith effort to repay her loans under the third prong of the *Brunner* test.

Likewise, under *Brunner's* second prong, even assuming Plaintiff could show that she could not maintain a minimal standard of living if forced to repay her loans—which she cannot based on the present factual record—she is regardless unable to show as a matter of law that additional circumstances exist indicating this state of affairs is likely to persist for a significant

---

[1] While the Government believes that Plaintiff cannot carry her burden on the first *Brunner* factor as well, factual discrepancies between the documents she has produced in this case and her claimed expenses preclude judgment as a matter of law on that prong based on the current factual record.

portion of the repayment period. While the Government does not contest that Plaintiff has, in the past, had serious health issues—specifically thyroid cancer and hypercalcemia—her deposition testimony reveals that the effects of these health issues are improving over time, and that Plaintiff is highly-educated (including a JD and LLM), and has worked across a variety of legal and non-legal fields, including as a teacher, firm lawyer, in-house counsel, real estate broker, and financial advisor. Moreover, with her current monthly household income of $6,982.33, Plaintiff's financial situation has significant room for loan repayment if she made efforts to minimize her expenses.

Thus, Plaintiff cannot meet her high burden to show the undue hardship that warrants the discharge of her loans by this Court. Judgment as a matter of law for the DOE is appropriate.

## FACTUAL BACKGROUND

### A.      Procedural History

On December 3, 2018, Plaintiff filed for Chapter 7 bankruptcy with the United States Bankruptcy Court for the Western District of North Carolina. (Bankr. No 18-31795, Doc. 1). On March 1, 2019, Plaintiff filed this adversary proceeding pursuant to 11 U.S.C. § 523(a)(8) against the Department of Education seeking discharge of her student loans. (Complaint, Doc. 1). Plaintiff was granted a discharge in her Chapter 7 bankruptcy case on March 5, 2019. (Bankr. No 18-31795, Doc. 24). This adversary proceeding was twice continued by joint motion so that Plaintiff could seek an administrative discharge—specifically a total and permanent disability ("TPD") discharge. (Docs. 11 and 15).

### B.      Summary Judgment Evidence

In addition to those documents publicly filed of which the Court may take judicial notice pursuant to Fed. R. Evid. 201, the Government relies on the following sources of evidence attached hereto in support of its Motion:

| **Exhibit 1**  | Declaration of Chris Bolander and attachments |
| **Exhibit 2**  | Plaintiff's Discovery Responses |
| **Exhibit 3**  | Plaintiff's Official Form 106, Doc. 26 in Bankr. No 18-31795 |
| **Exhibit 4**  | Deposition Transcript of Lynn Karen Hock |
| **Exhibit 5**  | TPD Discharge Application (Depo Ex. 5) |
| **Exhibit 6**  | Redfin home listing (Depo Ex. 8). |
| **Exhibit 7**  | Mortgage Statement |
| **Exhibit 8**  | July 2020 phone bill |
| **Exhibit 9**  | July 2020 AT&T bill |
| **Exhibit 10** | Credit Card Statements |

C.     **Plaintiff's Education, Employment, and Health History**

Plaintiff is highly educated, graduating from Brooklyn College with a BA in fine arts, Pepperdine University School of Law with a J.D., and New York University School of Law with an L.L.M. in tax. (Ex. 4, Dep. 11:2-6).

While Plaintiff is currently unemployed, her work history is varied across legal and non-legal jobs. As a lawyer she has done bankruptcy work for a small firm in California, served as in-house counsel at a video company, worked at a firm practicing in business litigation, and practiced at another firm practicing in the areas of insurance defense and business litigation. She is an inactive member of both the New York and California bars. In her non-legal jobs, Plaintiff has worked as a teacher at a private school in Manhattan, a junior account executive in advertising, a real estate broker for over 20 years, and most recently, a financial advisor at Merrill Lynch, which she left in June 2017. (Ex. 4, Dep. 11:12- 17:12).

Plaintiff is currently 69 years old, turning 70 in October. (Ex. 4, Dep. 10:21-23). She had two serious health events in her mid-sixties—thyroid cancer and hypercalcemia. Plaintiff was diagnosed with the thyroid cancer in 2016 and had a thyroidectomy—*i.e.* complete thyroid removal—in October 2016. Her treatment further involved two mega-doses of radiation treatment: one three months after the surgery and one the following year. Absent a recurrence, she will not receive any more radiation treatment. Due to the fact her thyroid was surgically removed, she takes

4

Synthroid, a mediation which takes the place of having that essential organ. Plaintiff testified to minor side effects from the Synthroid. Plaintiff is currently cancer free with her only treatment being yearly check-ups. (Ex. 4, Dep. 24:2-26:19).

During her cancer treatment, Plaintiff also experienced hypercalcemia, which she stated was an overdose on calcium from taking too many plain Tums as prescribed by her doctor that placed her in the emergency room. She testified that absent the hypercalcemia, she would have been back at work from the thyroid surgery within two weeks. Instead, the hypercalcemia left her debilitated, confused, and exhausted. Hock states these symptoms ultimately resulted in her being unable to continue her job as a financial advisor at Merrill Lynch, and the effects of the hypercalcemia linger today—for example, Plaintiff testified that in April 2018, she could not focus past 10:00 am and currently her focus starts to wane around 2:00 in the afternoon. (Ex. 4, Dep. 27:11-30:11).

**D.     Plaintiff's student loans**

Plaintiff's loans were for her son Trevor Hock's education at Berklee College of Music in Boston. (Ex. 4, Dep. 9:4-9). Specifically, Plaintiff Hock executed an Application and Master Promissory Note ("MPN") for a Federal Direct PLUS Loan in July 2013. (Ex. 1, ¶ 10). Disbursements were made from the MPN on September 21, 2013 for $47,00.00 at 6.41% per annum and on September 20, 2014 for $55,651.00 at 7.21% per annum. (*Id*. at ¶ 11). As of August 17, 2020, Plaintiff's student loan debt held by the Department of Education, was $143,581.48—comprised of $118,105.64 in principal and $25,475.84 in accrued interest. (*Id*. at ¶ 12). Outside of a three-month period starting December 2016, Plaintiff's loans have been in deferment from February 1, 2014 through the present. (*Id*. at ¶ 14). During the un-deferred period, Plaintiff made her only two payments on the loan, totaling $2,774.52. (*Id*. at ¶ 12).  Because the loan is a Parent

Plus loan, Plaintiff is solely responsible for repayment of the debt. (*Id.* at ¶ 10).

At 26 years old, Trevor Hock remains in school. (Ex. 4, Dep. 9:7-10:11, 56:18-19). He attended Berklee for three years, though Plaintiff took out loans for only two of those years. After failing to finish his education there, Trevor transferred to Pierce College, a community college in California, where he spent several years, recently graduating. He currently works in medical billing, and will continue to be enrolled in college this fall, starting full-time online at Cal State Northridge (Ex. 4, Dep. 24:2-26:19).

**E.    Plaintiff's income and expenses**

Plaintiff primarily relies on the financial information set forth in Schedules I and J of Form 106 filed in her Chapter 7 bankruptcy proceeding (Bankr. No 18-31795, Doc. 26). *See* (Ex. 4, Dep. 52:2-6) and (Ex. 2, Answers to ROG Nos. 6-9). For the Court's convenience, the Government has attached to this filing as an exhibit (Exhibit 3) to this Motion and further summarizes the relevant income and expenses set forth in that filing and Plaintiff's discovery responses (Exhibit 2) below:

| Monthly Income/Expense | Income | Expense |
|---|---|---|
| Plaintiff's Social Security Benefits | $1,423 | |
| Plaintiff's Husband's Veteran's Disability Award ($3,292.22), pension ($520.11) and Social Security Benefits ($1,747.00). | $5,559.33 | |
| Mortgage payment on four bedroom house with a dedicated boat slip | | $1,872.32 |
| Real estate taxes | | $230 |
| Property, homeowner's, or renter's insurance | | $177 |
| Home maintenance, repair, and upkeep expenses | | $200 |
| Homeowner's association or condominium dues | | $110 |
| Electricity, heat, natural gas | | $300 |
| Water, sewer, garbage collection | | $85 |
| Telephone, cell phone, Internet, satellite, and cable services | | $300 |
| Food and housekeeping supplies | | $1,000 |
| Clothing, laundry, and dry cleaning | | $120 |
| Personal care products and services | | $50 |
| Medical and dental expenses | | $228 |
| Transportation, including gas, maintenance, bus or train fare, but not car payments. | | $452 |

| | | |
|---|---|---|
| Entertainment, clubs, recreation, newspapers, magazines, and books | | $100 |
| Charitable contributions and religious donations | | $25 |
| Pet Insurance | | $35 |
| Sales Tax | | $100 |
| Vehicle Registration | | $150 |
| Vehicle 1 car payment | | $493.57 |
| Vehicle 2 car payment | | $437.71 |
| Payments to support son Trevor Hock | | $250 |
| Husband's hobbies and solo travel | | $250 |
| **Totals:** | **$6,982.33** | **$7,137.60** |

In her deposition, Plaintiff testified that some of these numbers varied slightly due to the COVID pandemic, see, e.g., Ex. 4, Dep. 41:4-12, and documents she has produced in this litigation also show discrepancies in monthly expenses (discussed as relevant in the argument sections below). Plaintiff further received tax refunds of $1,721 and $589 in 2018 and 2019 respectively. (Ex. 2, p. 11, Answer to Interrogatory No. 8).

## STANDARD OF REVIEW

A motion for summary judgment is governed by Fed. R. Civ. P. 56, made applicable here under Fed. R. Bank. P. 7056. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

In evaluating a summary judgment motion, a court "must consider whether a reasonable [factfinder] could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant." *In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). In doing so, a court is not entitled to either weigh the evidence or make credibility determinations. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the

weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). If the moving party is unable to demonstrate the absence of any genuine issue of material fact, summary judgment is not proper and must be denied. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 351–352 (4th Cir. 2007).

"The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but must come forward with specific facts showing that there is a genuine issue for trial." *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Those specific facts must be supported by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . " *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there by no genuine issue of material fact. *Anderson*, 477 U.S. at 247–248, (1986). A "scintilla of evidence" provided by the non-movant is insufficient to establish "concrete evidence" that a reasonable factfinder could find in the non-movant's favor at trial, *id.* at 252, 256, whereas the moving party may establish its right to judgment as a matter of law by showing that there is an absence of evidence to support the nonmoving party's case. *Cray Communications, Inc. v. Novatel Computer Systems, Inc.*, 33 F.3d 390, 393 (4th Cir. 1994) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720, at 10 (2d ed. Supp. 1994) and *Celotex*, 477 U.S. at 325).

### LEGAL STANDARD GOVERNING THE DISCHARGE OF STUDENT LOANS

### I.     The discharge of student loans generally

A debtor cannot discharge a student loan through normal bankruptcy proceedings. *Frushour v. Educ. Credit Mgmt. Corp.*, 433 F.3d 393, 396 (4th Cir. 2005). Instead, Congress made it more difficult to discharge student loans to protect the integrity of the student loan program and in exchange for the bargain students receive when borrowing money to pursue an education. *Id.* at 399 ("Debtors receive valuable benefits from congressionally authorized loans, but Congress in turn requires loan recipients to repay them in all but the most dire circumstances."); *see also Brunner v. New York State Higher Educ. Servs. Corp.*, 46 B.R. 752, 756 (S.D.N.Y. 1985) ("In return for giving aid to individuals who represent poor credit risks, it strips these individuals of the refuge of bankruptcy in all but extreme circumstances."), *aff'd*, 831 F.2d 395 (2d Cir. 1987).

"Since the decision of whether or not to borrow for a college education lies with the individual, it is the student, not the taxpayers, who must accept the consequences of the decision to borrow." *Pa. Higher Educ. Assistance Agency v. Faish*, 72 F.3d 298, 305 (3d Cir. 1995) (quoting *In re Robertson*, 999 F.2d 1132, 1137 (7th Cir. 1993)). In other words, when a student loan borrower accepts money from the government, he strikes a bargain, and "[l]ike all bargains, it entails risk. It is for each student individually to decide whether the risks of future hardship outweigh the potential benefits of a deferred-payment education." *Brunner*, 46 B.R. at 756.

**II.    The Fourth Circuit has adopted the *Brunner* test to determine undue hardship.**

Student loans such as Plaintiff's are dischargeable only where repayment of the loans creates an "undue hardship" upon the debtor. *See* 11 U.S.C. § 523(a)(8). While the bankruptcy code does not define "undue hardship," as this Court recognized in *In re Magsino*, No. 12-31997, 2014 WL 1341932, at *3 (Bankr. W.D.N.C. Apr. 4, 2014), the Fourth Circuit has explicitly adopted the three-part *Brunner* test. *See Ekenasi v. Education Res. Inst. (In re Ekenasi),* 325 F.3d

541 (4th Cir.2003) (adopting the *Brunner* test in chapter 13 cases); *Frushour,* 433 F.3d 393

(adopting the *Brunner* test in chapter 7 cases). To satisfy this test, the debtor must prove:

> (1) that the debtor cannot maintain, based on her current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans;

> (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

> (3) that the debtor has made good faith efforts to repay the loans.

*Frushour,* 433 F.3d at 400.

The burden is on the debtor to show, by a preponderance of the evidence, that each of the

three prongs is satisfied. *Spence v. Educ. Credit Mgmt. Corp.*, 541 F. 3d 538, 543-44 (4th Cir.

2008). If one of these factors is not shown, then the inquiry ends and the loan cannot be discharged.

*Id*. Finally, "[b]ecause Congress selected the word 'undue,' the required hardship under §

523(a)(8) must be more than the usual hardship that accompanies bankruptcy. Inability to pay

one's debts by itself cannot be sufficient; otherwise all bankruptcy litigants would have undue

hardship. The exception would swallow the rule, and Congress's restriction would be

meaningless." *Frushour*, 433 F.3d at 399.

## ARGUMENT AND AUTHORITIES

The DOE is entitled to summary judgment because Plaintiff cannot meet the latter two

*Brunner* factors. And as failing to meet any one factor is fatal to Plaintiff's claim for discharge,

the Government addresses the factors ordered by the ease in which the Court may grant judgment

as a matter of law.

### I.    Plaintiff cannot meet her burden under the third *Brunner* factor: she has not made good faith efforts to repay the loans.

The third *Brunner* factor requires good faith efforts to repay the student loans. Good faith

consists of the debtor's "efforts to obtain employment, maximize income, and minimize expenses."

*Educ. Credit Mgmt. Corp. v. Mosko,* 515 F.3d 319, 324, (4th Cir. 2008)*. Furthermore, a debtor

may not "willfully or negligently cause his own default, but rather his condition must result from

factors beyond his reasonable control." *Id*. Finally, the debtor must seriously pursue loan

consolidation options. *Id*.

With respect to her good faith efforts, Plaintiff has (1) only made two payments on her

loans, (2) failed to seriously pursue loan consolidation or income-based repayment options, (3)

failed to seriously pursue the administrative disability discharge that would be available to her if

the allegations pleaded in her Complaint are true, and (4) failed to make even minimal efforts to

minimize her expenses. Thus, even assuming *arguendo* that Plaintiff cannot further maximize

income due to her health and age, these facts taken together still demonstrate that she cannot meet

her burden under the third prong of the *Brunner* test, and as such, the Court should not grant her a

discharge.

A.    Instead of making payments on her loans, Plaintiff requested deferments for the life
of the loans based on her son's enrollment in school such that she has only had to
make two payments since 2014.

"In determining whether a debtor has made a good faith effort to repay a student loan

obligation, a primary consideration is whether the debtor actually made any payment on the

obligation, and if so, the total amount of the payments." *Stitt v. United States Department of

Education*, 532 B.R. 638, 644 (D. Md. 2015); *see also In re Spence*, 541 F.3d 538, 545 (4th Cir.

2008) ("[P]laintiff made efforts to obtain available deferments and forebearances, but after they

expired, she immediately filed for bankruptcy and has not made one payment on any of the loans

held by ECMC. Obtaining the deferment of student loans is not sufficient to demonstrate a good

faith effort to repay them when the deferment is followed by not one payment or any effort to work

out a reasonable payment schedule.").

Plaintiff's payment history is not reflective of a good faith effort to repay: two payments of $2,774.52 against an outstanding balance of $143,581.48. (Compl. ¶ 21 and Ex. 1, ¶ 12). Yet from February 2014 until June 2017, Plaintiff was making roughly $4,500 per month as a financial advisor at Merrill Lynch (in addition to her husband's income). (Ex. 2, p. 6, Answer to Interrogatory No. 6). She could have made her monthly loan payments then, but instead, sought a deferment based on her son being enrolled in school.

Notably, unlike a student in school taking out education loans—who is presumed to be receiving an education as opposed to working when the loans are disbursed—Plaintiff was employed as a Merrill Lynch financial advisor and did not need to seek a deferment. Indeed, deferment of Parent Plus loans is not automatic while the student is in school, rather, the parent must submit an application for deferment.[2] Plaintiff did so on this basis—and only paid during the short window the loans were not in deferment.  (Ex. 1, ¶ 14). Thus, Plaintiff's payment history does not support a good faith effort to repay the loans.[3]

B.    Plaintiff's failure to complete an application for a loan repayment plan belies any assertion of good faith efforts to repay her student loans.

Plaintiff has not seriously pursued loan consolidation options or an income-based repayment plan that would lower her monthly payments—which she is eligible for and based on her 2019 income, would be **zero dollars**.

A debtor's attempt (or lack thereof) to explore loan consolidation options or obtain an administrative discharge is considered by the court when applying the undue hardship analysis under § 523(a)(8). *See Frushour*, 433 F.3d at 402 (citing *Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete)*, 412 F.3d 1200, 1206 (10th Cir. 2005)). "Although not always dispositive, it illustrates

---

[2] *See, .e.g.,* https://studentaid.gov/sites/default/files/ParentPLUSBorrowerDeferment.pdf
[3] While it is true the DOE granted her deferment request, that fact is irrelevant to the issue of whether she herself made a good faith effort to repay the loans. She did not.

that the debtor takes her loan obligations seriously, and is doing her utmost to repay them despite her unfortunate circumstances." *Id.* (emphasis added) (citing *Tirch v. Penn. Higher Educ. Assistance Agency (In re Tirch),* 409 F.3d 677, 680, 682-83 (6th Cir. 2005)).

If Plaintiff consolidated her loans, she would be eligible to participate in the Income-Contingent Repayment ("ICR") plan. (Ex. 1, ¶ 15). And if she did so, based on the total amount of her loans, her family size, and the adjusted gross income from her tax returns,[4] her ICR payment would be zero dollars per month. (*Id.*). Further, if she consolidated, she would still maintain her eligibility for any deferment, forbearance, discharge, or forgiveness options currently available. (*Id.* at ¶ 17).

Despite this, Plaintiff admits she has not applied for ICR. (Ex. 2, p. 20, RFA No.1 Answer). In her responses to the Government's Requests for Admissions, she claims she researched the ICR program and "made the substantive decision that the program did not work well for her circumstances." (*Id.*). Her deposition testimony reveals that this research was, in her own words, "just minor" and it would have been "a Google search probably, if anything" (Ex. 4, Dep. 60:20-61:18), and that rather than seeking consolidation of her loans, she merely pursued discharge here. (Ex. 4, Dep. 60:25-61:11, "Q. … And I believe I would have to go through refinancing the loan out of a Parent PLUS loan, combining the two or something like that before I could even do it, and then it takes it out of the deferral. And I don't – and inasmuch as I was in the bankruptcy case, circumstance are what they are that I would do this. Q. And by 'this,' you mean sue in an adversary proceeding for forgiveness of your Parent PLUS loans? A. Correct.").

Relatedly, Plaintiff demonstrates a general lack of awareness regarding her loan's monthly payment that is indicative of a lack of serious thought given towards repayment. For example, she

---

[4] *See, .e.g.*, https://www.irs.gov/e-file-providers/definition-of-adjusted-gross-income

incorrectly lists the amount of the monthly loan payment on Schedule J filed in her bankruptcy case as $1,500, (Exhibit 3, p. 6), despite the fact that her billing statements clearly detail it as $1,387.26. (Ex. 1, Attachment D). And she further appears to believe that her monthly payment itself would fluctuate based on interest accrued. (Ex. 4, Dep. 56:20-58:17).

Thus, the fact that Plaintiff has put forth almost no effort to consolidate her loans and seek ICR—or even understand the import of pursuing such options—should be considered by the Court as an important component of the good faith inquiry. *See In re Mosko*, 515 F.3d at 326 ("We have stated that seeking out loan consolidation options is 'an important component of the good-faith inquiry' because such efforts demonstrate that the debtors take their debts seriously and are doing their utmost to repay them despite their unfortunate circumstances."); *Frushour* 433 F.3d at 402 ("The debtor's effort to seek out loan consolidation options that make the debt less onerous is an important component of the good-faith inquiry.").

For example, in *Frushour*, the Fourth Circuit held that plaintiff failed to establish good faith efforts to repay his loans where the plaintiff refused to "seriously consider the income contingent plan under the William D. Ford Direct Loan Program" and "refuse[d] to take [this] simple step that would have allowed him to fulfill his commitments in a manageable way." *Frushour*, 433 F.3d at 403.

Plaintiff has likewise failed to consider ICR or take the simple steps that would—at present—reduce her monthly payment to zero. She cannot therefore be credited with good faith efforts. *See further In re Augustin*, 588 B.R. 141, 154 (Bankr. D. Md. 2018) ("The record shows that Mr. Augustin is not willing to accept a manageable repayment plan that would permit him to manage the repayment of his student loans. This shows a lack of good faith on his part."); *Tirch v. Pa. Higher Educ. Assistance Agency*, 409 F.3d 677, 683 (6th Cir. 2005) ("Because Tirch declined

to take advantage of an ICR that would have been advantageous, he failed to sustain the heavy burden of proving that he made a good faith effort to repay his loans."); *Alderete v. Educ. Credit Mgmt. Corp.*, 412 F.3d 1200, 1206 (10th Cir. 2005) (plaintiff's failure to consider alternate repayment options prior to filing for bankruptcy contributed to a finding of lack of good faith); *Roth v. Educ. Credit Mgmt. Corp. (In re Roth)*, 490 B.R. 908, 919 (9th Cir. BAP 2013) (noting that a debtor's refusal to enroll in an Income-Based Repayment Plan cannot be "discount[ed]" and has "often tipped the good faith balance against a debtor"); *Russ v. Tex. Guaranteed Student Loan Corp.*, 365 B.R. 640, 646 (Bankr. N.D. Tex. 2007) ("the failure to attempt to renegotiate the terms of the student loan or to participate in an ICR supports a finding of a lack of good faith"); *Thoms v. Educ. Credit Mgmt. Corp.*, 257 B.R. 144, 150 (Bankr. S.D.N.Y. 2001) (denying student loan discharge at least in part due to debtor's failure to avail himself of payment options).

C.    <u>Plaintiff's failure to pursue a disability discharge further undercuts any assertion of good faith efforts.</u>

Likewise, Plaintiff has failed to seek a total and permanent disability ("TPD") discharge despite the fact that this case was continued for an entire year so that she could do so. (Docs. 11 and 15; Ex. 2, p. 20, RFA No. 2 Answer). To be clear, the Government is not asserting that Plaintiff must pursue an administrative discharge prior to seeking relief from this Court—*i.e.,* the DOE should be granted summary judgment because Plaintiff failed to exhaust her administrative remedies. *See, e.g., In re Lagueux*, 604 B.R. 249, 251 (Bankr. D.S.C. 2019) ("A debtor may be entitled to a discharge of his student loans under § 523(a)(8) without qualifying for a total and permanent disability administrative discharge, and vice versa.") (citing *In re Cagle*, 462 B.R. 829, 831 (Bankr. D. Kan. 2011)). However, the fact that Plaintiff has not done so *is relevant* to the good faith inquiry:

> A debtor's disability and his attempt (or lack thereof) to obtain an administrative discharge may be considered in an undue hardship analysis under § 523(a)(8). The good faith requirement is sufficiently malleable to cover a wide array of conditions. For example, the bankruptcy court may determine the debtor lacks a good faith attempt to repay the loan when administrative remedies are available to him but are not pursued. Likewise, where a debtor requests an administrative discharge before filing bankruptcy, the court may require the debtor to complete, or exhaust, the administrative process before making a § 523(a)(8) determination.

*In re Cagle*, 462 B.R. at 832 (Bankr. D. Kan. 2011).

This is especially true here. Taking the allegations in Plaintiff's Complaint as true, she would appear eligible for the TPD discharge. *Compare* Compl. ¶ 10 ("Ms. Hock's medical condition renders her unemployable now and for the rest of her life.") *with* Exhibit 5, TPD Discharge Application, Section 4 (physician's certification that applicant has a "medically determinable physical or mental impairment that prevents the applicant from engaging in any substantial gainful activity.").

Yet the only efforts Plaintiff made to apply for the TPD Discharge—in the year this case was continued for her to do so—was to see her primary care physician **once** during a separately scheduled visit, bring the discharge form with her, and ask her primary care doctor to complete it. (Ex. 4, Dep. 62:5-73:13). At that single visit, her primary care physician was unwilling to fill out the certification under penalty of perjury (but importantly, did not tell Plaintiff it was her medical opinion that Plaintiff could not meet the criteria for the TPD discharge), and Plaintiff did not attempt to see any other doctors regarding the TPD discharge. (Ex. 4, Dep. 74:24-78:14).

Simply put, Plaintiff's single visit to one doctor over the course of a year who was unwilling to sign a form under penalty of perjury does not constitute a good faith effort to avail herself of that available administrative discharge.

D.      Plaintiff's failure to minimize expenses is inconsistent with a good faith effort to repay her loans.

A comparison of Plaintiff's household income to her alleged expenses—taken as true and

16

viewed in the light most favorable to the Plaintiff— indicates that Plaintiff's financial condition is of her own making. *See In re Mosko*, 515 F.3d at 325-26 (finding lack of good faith in instances where "flagrant spending suggests that Plaintiff's own negligence contributed to his financial situation."). As a threshold issue, both Plaintiff's monthly income and her husband's monthly income should be considered. *See In re Augustin*, 588 B.R. 141, 150–51 (Bankr. D. Md. 2018) ("The DOE contends the court should consider total household income and expenses. This is not a novel issue, and the courts within the Fourth Circuit have determined that family income, even that of non-debtor spouses, should be included in the analysis.") (collecting cases). And likewise, Plaintiff generally lists her expenses as shared household expenses.

Plaintiff and her husband have a monthly household income of $6,982.33 or roughly $83,787.96 per year. (Ex. 2, pp. 10-11). This puts them multiples above the current poverty level of $17,240 for a household of two.[5] *See U.S. Dep't of Health & Human Servs. v. Smitley*, 347 F.3d 109, 122 (4th Cir. 2003) ("The Smitley family grossed $42,000 per year in 2000, the year immediately following the bankruptcy filing. This is not a substantial income, but, as in *Rice,* 78 F.3d at 1150, repayment of the HEAL loan would 'not force' the family 'to maintain a standard of living below or even near the poverty level . . . Although not dispositive, the Poverty Guidelines provide at least a modicum of objectivity in assessing unconscionability. Certainly no court has suggested and not even Smitley contends, as the dissent seems to, that if his family income (after taxes) does not exceed twice the "government-set poverty figure" for a family of six that this

---

[5] The U.S. Federal Poverty Guidelines are issued each year in the Federal Register by the Department of Health and Human Services (HHS), and the 2020 poverty guideline for a family of two is $17,240. *See* https://www.federalregister.gov/documents/2020/01/17/2020-00858/annual-update-of-the-hhs-poverty-guidelines; *In re Perez*, No. 16-28473-B-7, 2018 WL 1037408, at *3, n.3 (Bankr. E.D. Cal. Feb. 20, 2018) (referencing poverty guidelines and their available weblink on HHS's website).

should be a factor weighing in *favor* of discharge.") (emphasis in original and citing to HHS Poverty guidelines").[6]

This substantial monthly income is offset by a number of expenses that could be minimized:

- <u>Plaintiff's residence</u>: On April 4, 2018—*after* Plaintiff took out her students loans, made only 2 payments, underwent her thyroid surgery and cancer treatment, and ceased working at her job as a financial advisor at Merrill Lynch in June 2017—Plaintiff and her husband purchased for $375,000 a four-bedroom, 2.5-bath home in the Blue Stone Harbor neighborhood near Lake Norman with a dedicated boat slip. Only Plaintiff and her husband live in the house. (Ex. 4, Dep. 38:2-39:12). The claimed monthly mortgage payments on the house are $1,872.32 (Exhibit 3, p. 5), though mortgage statements produced by Plaintiff show a $2,220.39 regular monthly payment (Exhibit 7), and the house comes with a variety of expensive monthly fees: $230 in real estate taxes, $177 in homeowner's insurance, $200 in maintenance/upkeep, $110 in HOA dues, $300 in electricity and heating costs, and $85 in water/sewer/garbage collection—for a total, at minimum depending on the mortgage payment, of $2,974.32. (Exhibit 3, pp. 5-6). While Plaintiff will certainly always have some monthly cost for many of these expenses, this category of expenses could be greatly minimized, and a household of two can find a comfortable residence that is not a four bedroom house with a boat slip by Lake Norman. And importantly, Plaintiff chose to incur all of these household-related expenses after her job at Merrill Lynch ended and with the knowledge that her loans would eventually come out of deferment, cutting against a good faith effort to minimize expenses. *See Smitley*, 347 F.3d at 124 ("Smitley rents a two-level, three-bedroom house for $1,250 a month, owes a car payment of $434 per month on one of his

---

[6] In addition to their monthly income, Plaintiff did not apply the federal tax refunds received in 2018 and 2019 to her debt.

automobiles (a van) . . . Surely, as his children reach age 18 (and possibly even before), Smitley could at least reduce his monthly shelter and transportation expenses (or request contributions toward housing and food from his children after they reach majority).").

- **Plaintiff's vehicles**: Plaintiff and her husband lease two Lexus SUVs for $493.57 and $437.71, despite the fact that neither of them are employed. (Ex. 3, p. 6 and Ex. 4, Dep. 39:9-40:9). The monthly vehicle registration/tax for these two Lexus vehicles is $150, and the cost of gas is $452 (Ex. 3, p. 6). Consolidation to one household car that is not a luxury vehicle would cut vehicle related expenses drastically. *See Educ. Credit Mgmt. Corp. v. Waterhouse*, 333 B.R. 103, 111 (W.D.N.C. 2005) ("While it may be a hardship for Appellee to reduce some expenses (such as the telephone bill) or trade his truck for a more affordable vehicle (or simply maintain one vehicle in the household) to allow for repayment of his voluntarily incurred student loan debt, it is not an *undue* hardship."); *In re Henry*, No. 14-70113, 2016 WL 3681201, at *6 (Bankr. C.D. Ill. July 5, 2016) (finding, *inter alia*, expenses for multiple vehicles as a factor that debtor's financial problems were of her own making and she had not made sufficient efforts to minimize expenses). Certainly, $452 per month in gas for two unemployed persons not commuting to work is an unnecessary expense.

- **Plaintiff's telephone, cable, and internet:** Plaintiff lists a monthly expense of $300 for her cable, internet, and phone expenses (Ex. 3, p. 6); however, her monthly bills produced in this litigation reveal this expense is both quite a bit higher and filled with unnecessary payments. For example, Plaintiff's July 2020 phone bill of $257.88 reveals that the highest individual portion of that is incurred by paying for her 26-year old son's phone ($78.30 for Trevor Hock's line), with additional charges for an unlimited data plan for three devices ($45.94 for Plaintiff, her husband, and Trevor Hock). (Exhibit 8). Similarly, Plaintiff's July 2020 cable and internet bill for $259.56

shows a premium Direct TV package—entitled the XTRA package—with further unnecessary monthly add-ons such as $50.99 for HBO, $4.99 for the movies extra pack, $25 for an advanced receiver, and $14 for the two-client subscription service. (Exhibit 9, July 2020 AT&T bill). Plaintiff's bank accounts and credit card statements further reveal Netflix, New York Times, and Disney Plus subscriptions, as well as numerous Amazon purchases (*See, e.g.*, Exhibit 10). Even assuming Plaintiff spends just $300 per month on these expenses as listed, payments for premium channels, HBO, Netflix, Disney Plus, the New York Times, unlimited data, and her adult son's phone bill are unnecessary expenses that can be minimized. Indeed, many courts—including the Fourth Circuit—have held this entire category of expenses unnecessary. *See Mosko*, 515 F.3d at 325 (monthly expenditures of "$75 for internet, $80 for cell phones, $60 for satellite television… are generally unnecessary to maintain a minimum standard of living" and "the failure to minimize or eliminate [such] expenditures does not demonstrate a good-faith effort to minimize expenses"); *see also Educ. Credit Mgmt. Corp. v. Buchanan*, 276 B.R. 744, 751-52 (N.D. W.Va. 2002) (foregoing satellite television, internet service or movie rentals does not constitute an undue hardship); *Pincus v. Graduate Loan Center*, 280 B.R. 303, 317-18 (Bankr. S.D.N.Y. 2002) (finding monthly expenses such as $80 for telephone and $65 for cable with premium channels, "excessive in light of the sacrifice expected of an individual to repay his student loan obligations"); *East v. U.S. Dept. of Education*, 270 B.R. 485, 494 (Bankr. E.D.Cal. 2001) (observing that cable television "is not part of a minimal standard of living").

- <u>Food and housekeeping supplies</u>: Plaintiff testified in her deposition this $1000 listed expense was primarily for food and currently fluctuates between $800 and $1000 per month. (Ex. 4, Dep. 45:12-21). While Plaintiff and her husband certainly must eat, $1,000 per month for a household of two is an amount of spending on food that indicates no effort to minimize costs.

For reference, the USDA publishes a monthly cost of food report that, for July 2020, lists the average monthly cost in the United States for a family of two between 51-70 years old across various food plans as: $383.70 (thrifty plan), $496.30 (low cost plan), $619.60 (moderate cost plan), and $746.80 (liberal plan).[7] In all, Plaintiff's spending on food does not support a good faith effort to minimize expenses.

- <u>Payments in support of Trevor Hock</u>: In addition to paying for his phone, Plaintiff testified that she paid $250 per month from 2017 until roughly June/July 2020 for her now 26 year-old son's car insurance, in addition to other payments at various intervals (Ex. 4, Dep. 55:2-56:19). Paying a significant amount monthly to her adult son is an unnecessary expense and inconsistent with a good faith effort to repay her loans. *See Educ. Credit Mgmt. Corp. v. Gouge*, 320 B.R. 582, 586 (W.D.N.C. 2005) (characterizing "$200 per month in support for two emancipated step-children as to whom [debtor] has no legal obligation to provide any support" as an unnecessary expense).

- <u>Charitable/religious donations</u>: Plaintiff donates $25 per month. Likewise, while perhaps admirable giving, this is an unnecessary expense to maintain a minimal standard of living and inconsistent with a good faith effort to repay her loans.

In sum, Plaintiff fails the third prong of the *Brunner* test based upon the totality of the indisputable evidence contained in her deposition testimony, discovery responses, and documents produced in this case. Plaintiff has failed to make more than minimal efforts to pay down her student debt; failed to actively pursue and complete an IRC application, which is the only repayment plan for which she is eligible; failed to actively pursue and complete a TPD discharge

---

[7] https://fns-prod.azureedge.net/sites/default/files/media/file/CostofFoodJul2020.pdf

application outside of one doctor's visit; and failed to minimize her expenses. These facts, taken as a whole, show that Plaintiff has not acted in good faith to repay her student loans.

II.     **Plaintiff cannot meet her burden under the second *Brunner* factor: she cannot show a state of affairs under which she cannot maintain a minimal standard of living is likely to persist for the life of her loans.**

The second *Brunner* factor is "prospective in nature and looks for exceptional circumstances beyond the debtor's current situation," is "the heart of the *Brunner* test," and is a "demanding requirement" which will only be found in "rare circumstances." *Frushour*, 433 F.3d at 401. It is only satisfied if plaintiff can demonstrate that additional circumstances exist indicating that his state of affairs is likely to persist for a significant portion of the repayment period of the students loans. For example in *Spence v. Educ. Credit Mgmt. Corp.*, the plaintiff was in her late 60's, suffered from diabetes and high-blood pressure, had a low paying job, and met the requirements of the first prong of the *Burner* test. 541 F.3d 538, 544 (4th Cir. 2008). The Fourth Circuit nevertheless held that she did not have the "rare circumstances" necessary to obtain a discharge. *Id*.

The Government does not contest that Plaintiff had, in her past, serious health events. But she is now cancer free, states the side effects from her thyroid replacement medication are "minor", and testified that the effects of her hypercalcemia are improving, with her now able to maintain focus until 2:00 pm in the afternoon. In light of that, given her extensive education and work history, there is no basis for Plaintiff to show her health will present an additional circumstance under which she would never be able to improve her income prospects for the remainder of the repayment period for her loans. *See, e.g.*, *In re Thomas*, 931 F.3d 449 (holding that an unemployed 62-year-old debtor with diabetic neuropathy was capable of employment in sedentary work environments, creating income, and failed *Brunner*'s second prong).

Importantly, Plaintiff cannot rely on her age alone or the fact that she obtained the loans late in life as an additional circumstance.[8] *See In re Spence*, 541 F.3d at 544 (stating as to debtor in late 60's: "We are not unsympathetic to the disadvantages of her current circumstances, but the facts point to no 'additional circumstances,' outside of the normal hardships faced by bankruptcy petitioners, that would render her situation hopeless."). Plaintiff was fully aware of her age when she took out the loans (Ex. 4, Dep. 19:15-20:6), but choose to defer them while her son spent over six years enrolled in school. *See In re Little*, 607 B.R. 853, 861 (Bankr. N.D. Tex. 2019) ("The Littles chose to go to school later in life; the repayment of debts will thus last into their later years. Age also does not prevent the Littles from collecting pension payments; instead, their monthly income should increase upon turning 65. There is no indication from the record that the Littles have an additional circumstance that would make them unable to pay *anything* on their student loan debt in the coming years.") (emphasis in original and internal citations omitted).

And here, neither age nor health prevent Plaintiff from currently having a household income of $6,982.33. Given the expansive room for future minimization of the expenses detailed in Section I.D above, she cannot be said to have a "certainty of hopelessness" that repayment of her loan would force her below a minimal standard of living. *See In re Perez*, No. 16-28473-B-7, 2018 WL 1037408, at *7 (Bankr. E.D. Cal. Feb. 20, 2018) ("In short, Plaintiffs do not face insurmountable barriers to the repayment of their student loans during the loan repayment period. If anything, Plaintiffs' current financial situation is more the product of choice in the spending of monthly paychecks rather than ill health, lack of education, or some other circumstance beyond their control that is likely to continue over a loan repayment period. Moreover, because Plaintiffs

---

[8] Indeed, Plaintiff appears to blame the DOE for approving her loan based on her age—despite the fact that she herself was a Merrill Lynch financial advisor when she applied for and received the loan. (Ex. 2, at p. 2-3, Answer to Interrogatory No. 1).

have elected to allocate funds that could be used to repay their student loans to non-essential items, they are unable to prove that they have adverse financial conditions that are likely to persist into the future and during a significant portion of the repayment period.").

Thus, the summary judgment evidence dictates that Plaintiff additionally and alternatively fails the second *Brunner* prong.

## CONCLUSION

The evidence drawn from Plaintiff's filed pleadings, discovery responses, deposition, and documents produced demonstrates that she cannot meet her burden under the second and third prongs of the *Brunner* test. The factual discrepancies identified as to her expenses—such as her mortgage payments and phone/cable/internet bills—make summary judgment as to the first *Brunner* prong currently inapposite, though the DOE may be later entitled to judgment as a matter of law on this factor should these be resolved. In any case, Plaintiff's failure to meet her burden under any one prong of the *Brunner* case is fatal.

For the foregoing reasons, the Department of Education asks the Court to grant its Motion for Summary Judgment.

This 24th day of August, 2020.

Respectfully submitted,

R. ANDREW MURRAY
UNITED STATES ATTORNEY

/s/ Seth Johnson
J. Seth Johnson
NC Bar No. 53217
Assistant United States Attorney
Suite 1650, Carillon Building
227 West Trade Street
Charlotte, North Carolina 28202
Telephone: (704) 338-3159
seth.johnson@usdoj.gov