FILED & JUDGMENT ENTERED
Steven T. Salata

March 17 2021

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

J. Craig Whitley
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **BANKR. NO. 18-31795** |
| **LYNN KAREN HOCK,** | ) | |
| | ) | **CHAPTER 7** |
| Debtor | ) | |
| ——————————— | ) | |
| | ) | |
| **LYNN KAREN HOCK,** | ) | |
| | ) | |
| Plaintiff, | ) | **ADV. PRO. NO. 19-03016** |
| | ) | |
| v. | ) | |
| | ) | |
| **DEPARTMENT OF EDUCATION,** | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————— | ) | |

## MEMORANDUM OPINION AND ORDER DENYING DISCHARGEABILITY OF STUDENT LOAN DEBT

This matter is before the Court upon the Complaint of Debtor Lynn Karen Hock ("Hock") seeking the discharge of her student loan debt owed to the Department of Education ("Government") under 11 U.S.C. § 523(a)(8). Having considered the evidence and the legal arguments presented, the undersigned finds for the Government. Hock's student loan debt is not dischargeable.

## BACKGROUND

On December 3, 2018, Hock filed a voluntary Chapter 7 case in this District. On March 1, 2019, Hock filed this adversary proceeding seeking discharge of her student loans which approximate $143,581.48. Hock received a general discharge on March 5, 2019.

After taking discovery, the parties agreed to a stand down so that Hock might seek an administrative discharge of her student loan debts with the Government. She did not pursue that option, and by September 28, 2020, the matter was back in court on cross summary judgment motions under Fed. R. Civ. P. 56 and Fed. R. Bank. P. 7056. At the conclusion of the hearing, a bench ruling was announced denying both motions, it appearing that a ruling would necessarily require weighing conflicting evidence. Thereafter, the parties entered into Joint Stipulations of Facts and Admissibility of Documents.[1] At a hearing held on January 11, 2021, the two sides agreed that the matter be tried on the same, and without live testimony.[2] The matter was taken under submission.

## STIPULATED FACTS[3]

### A. **Plaintiff Lynn Karen Hock**

1.  Hock is a seventy-year-old female who has not been employed since June 2017. Hock is not currently seeking employment due to her medical conditions, and her responsibilities at home caring for her permanently disabled husband.

2.  Hock's husband, a former Navy SEAL, became permanently disabled while

---

[1] The Joint Stipulations of Facts and Admissibility of Documents (Doc. No. 31) also includes Hock's sworn testimony found in her deposition transcript.

[2] *Id.* at 3. A review of the Joint Stipulations reveal that the parties are not in agreement as to all facts. For example, in stipulation #9, the parties state that Hock would testify that she cannot focus for more than 2 hours and is presently unable to hold a job. The Government does not agree with that testimony, and elsewhere maintains that Hock's condition is substantially better and that she is employable on a part-time basis. However, the Government does not object to the admission of this testimony either. Fortunately, the few remaining disputed facts are not necessary to a determination of this action.

[3] The parties stipulations are recited verbatim with only conformation of the names, for the sake of clarity.

fighting in active combat during the Vietnam War and has not been employed since 2012. The Veteran's Administration has deemed him unemployable. His service-connected disability is 90%, being paid at the 100% rate because he is "not employable due to service-connected disabilities."

3.   Hock graduated from Brooklyn College with a BA in fine arts, Pepperdine University School of Law with a J.D., and New York University School of Law with an L.L.M. in tax.

4.   Hock's last employment was as a financial advisor at Merrill Lynch. She was forced to resign from that position after life-saving cancer surgery was complicated by acute hypercalcemia. She was rushed to the hospital by ambulance for emergency treatment 10 days after cancer surgery. Prior to Merrill Lynch, Hock held, inter alia, various jobs as a lawyer and was a real estate broker for 20 years. The Government's questioning and Hock's sworn testimony related to her work history is found at her Depo Tr. 11:12- 17:12 (Doc. 19-1, Ex. 4).

5.   In 2016, Hock was diagnosed with Stage 3 thyroid cancer, and in October 2016, she had surgery at UCLA to remove her thyroid gland, lymph nodes, and parathyroid glands.

6.   Her treatment further involved two mega-doses of radiation treatment—one three months after the surgery and one the following year.

7.   Due to the fact her thyroid was surgically removed, Hock takes Synthroid, a mediation that takes the place of having that essential organ.

8.   Hock is currently cancer-free but has yearly scans, blood tests, and check-ups with her endocrinologist to check for recurrence of cancer and ensure therapies to

replace thyroid function are still at optimum levels.

9.    The Government's questioning and Hock's sworn testimony related to her cancer treatment and related symptoms is found at her Depo Tr. 24:2-26:19 (Doc. 19-1, Ex. 4).

10.   Hock added the following testimony: "Hock continues to suffer from the effects of cancer and complications with recovery from acute hypercalcemia. She has difficulty concentrating or sitting at a desk for more than 2 hours at a time, is unable to complete routine tasks without taking breaks, and has arthritis in her knees and consistent pain with discs in her lower back which prevent her from standing for more than 30 minutes at a time. She has fixated on death and dying since her cancer diagnosis 4 years ago and has been depressed about being asked to leave her job and her inability to work in the future."

11.   The Government does not object to the introduction of Hock's testimony in written form for the court's consideration, obviating the need for any further live testimony.

12.    During her cancer treatment, Hock experienced acute hypercalcemia, an overdose of calcium which was prescribed by her surgeon following her cancer surgery. Hock was rushed to the hospital via ambulance for life-saving treatment after she went into toxic shock and her organs began shutting down. The Government's questioning and Hock's sworn testimony related to her hypercalcemia and related symptoms is found at her Depo Tr. 27:2-32:19 (Doc. 19-1, Ex. 4).

13.   Hock contends that due to these health events and their continuing symptoms, she was unable to continue and left her job at Merrill Lynch approximately 5 months

after returning from a 3 ½ month medical disability leave.

14.     In April 2018, Plaintiff and her husband moved from California, their long-time home, to North Carolina in an effort to reduce expenses. On December 3, 2018, Hock filed for Chapter 7 bankruptcy with the United States Bankruptcy Court for the Western District of North Carolina. (Bankr. No 18-31795, Doc. 1).

15.     Hock's Chapter 7 bankruptcy case was discharged without any assets being liquidated or administered by the Chapter 7 Trustee, and without objection from any of her creditors. (Bankr. No 18-31795, Doc. 25). As stated on Hock's Official Form 101 (Bankr. No 18-31795, Doc. 1), Hock's household "current monthly income" in her underlying bankruptcy case is $520.11 per month as calculated under Section 101(10A) of the Bankruptcy Code. Hock's household "disposable income" in the underlying bankruptcy case was therefore $0 per month because her allowed monthly expenses exceeded $520.11 per month.

## B.  The Student Loans

16.     On or about July 29, 2013, Hock executed an Application and Master Promissory Note ("MPN") for a Federal Direct PLUS Loan.

17.     The loan was taken out on behalf of Hock's son, Trevor Hock, for his studies at Berklee College of Music. Trevor Hock is currently 26 years old and enrolled full-time at California State University Northridge. All of Trevor Hock's classes are online during Fall 2020 due to COVID-19 pandemic restrictions.

18.     The loan is a Parent PLUS loan and Hock is solely responsible for the repayment of the debt (i.e. it is not a co-signed debt between the parent and the student).

19.     Disbursements were made on September 21, 2013 for $47,00.00 at 6.41% per

annum and on September 20, 2014 for $55,651.00 at 7.21% per annum. Interest

rates are determined by regulation 34 CFR 685.202(a)(9)(iv).

20. As of August 17, 2020, Hock's student loan debt held by the Department of

Education, is $143,581.48 of which $118,105.64 is principal and $25,475.84 is

accrued interest.

21. Hock has made two payments on the loan totaling $2,774.52.

22. The loan was in repayment for a brief three-month period beginning in December

2016 but has otherwise been in a deferment status from February 1, 2014, through

the present. This deferment status is currently scheduled to expire on February 25,

2021. The deferments were input at the request of Hock and are permitted per 34

CFR 685.204(c)(s), which details provisions for deferment based on the

enrollment status of Trevor Hock. Hock's student loans with The Government

have remained current and in good standing at all times since they were originated

in 2014.

*1.   Income-Contingent Repayment Plan*

23. Parent PLUS loans, such as Hock's, are not eligible for income-driven repayment

plans. Upon entering repayment, Hock is currently scheduled for a standard, 10-

year amortization (minus any previous time in repayment), monthly repayment

amount that changes daily because of accruing interest, but which would be

approximately $1,680 in February 2021. However, consolidation of Hock's

current Parent PLUS loans would allow her to participate in the Income-

Contingent Repayment ("ICR") plan, which is not available to Parent PLUS

borrowers without consolidation. (*See* 34 CFR 685.208(a)(2)(iv)(D)). Thus, to

repay her student loans under ICR, Hock would need to consolidate her Parent PLUS loans into a Direct Consolidation Loan, and then apply for an ICR plan.[4]

24.    Under ICR, a borrower's monthly repayment amount is generally based on the total amount of the borrower's Direct Loans, family size, and adjusted gross income ("AGI") reported by the borrower on their tax returns for the most recent year.

25.    Under ICR, student loan payments will be $0 per month whenever a borrower makes less than 100% of the HHS Poverty Guidelines for their family size. (*See* 34 CFR 685.209(b)(1)). Under the ICR calculations, Hock's household makes less than 100% of the HHS Poverty Guidelines for her family size, and therefore her student loan payments would be $0 per month under ICR. For borrowers above this threshold, monthly payments are equal to 20% of discretionary income, divided by 12.

26.    For ICR, a borrower's "discretionary income" is the amount they earn over 100% of the HHS Poverty Guideline for their family size (adjusted annually). Under the ICR calculations, Hock's "discretionary income" is currently $0 per month and has not changed significantly since the filing of her Chapter 7 case.[5]

27.    Hock's AGI would need to exceed $100,000 to have a monthly ICR payment as high as her most recent loan payment amount of $1,387.26, and based on a family size of two (2), some estimated repayment scenarios for Hock would be:

---

[4] *See Consolidating your federal education loans can simplify your payments, but it also can result in the loss of some benefits,* https://studentaid.gov/manage-loans/consolidation; and *What is Income-Driven Repayment?,* https://studentaid.gov/app/ibrInstructions.action.
[5] *See Poverty Guidelines*, U.S. DEP'T OF HEALTH & HUMAN SVS. (Jan. 15, 2021), https://aspe.hhs.gov/poverty-guidelines.

| AGI | Monthly payment under ICR (estimated) |
| --- | --- |
| $17,240 or less | $0 |
| $25,000 | $129.33 |
| $35,000 | $296.00 |
| $45,000 | $462.67 |
| $55,000 | $629.33 |

28. The DOE calculates Hock's 2019 AGI as $11,499.00 based on documents produced in discovery.

29. Because Hock's 2019 AGI is less than $17,240, her "discretionary income" in ICR would be $0 per month, and her projected ICR payment would be $0/month if she were to consolidate her current loans.

30. Consolidation of Parent PLUS loans does not affect the availability of any deferment, forbearance, discharge, and forgiveness options currently available, including the Department of Education's Cancer Treatment Deferment and Total and Permanent Disability Discharge options.[6]

31. Hock has not sought consolidation of her loans or applied for the ICR plan after consulting with her attorney regarding the same prior to filing the present adversary proceeding.

32. The Government's questioning and Hock's sworn testimony related to her efforts regarding loan consolidation and ICR are detailed in her deposition testimony at her Depo Tr. 59:4-61:18 (Doc. No. 19-1, Ex. 4). Hock discussed her income-based repayment options with her attorney prior to filing the present adversary proceeding.

---

[6] *See Get Temporary Relief*, U.S. DEP'T OF EDUCATION, https://studentaid.gov/manage-loans/lower-payments/get-temporary-relief; and *Total and Permanent Discharge*, U.S. DEP'T OF EDUCATION, www.disabilitydischarge.com.

2. *Total and Permanent Disability Discharge*

33.    A Total and Permanent Disability Discharge ("TPD Discharge"), if granted, relieves a borrower of having to repay federal student loans on the basis of a total and permanent disability ("TPD").

34.    There are three ways to demonstrate a TPD, and relevant among them here is that the borrower, inter alia, submit a certification from a doctor of medicine (M.D.) or osteopathy (D.O.) who is licensed to practice in the United States that the borrower is totally and permanently disabled.

35.    The physician must certify that the borrower is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that:

- Can be expected to result in death;

- Has lasted for a continuous period of not less than 60 months; or

- Can be expected to last for a continuous period of not less than 60 months.[7]

36.    Hock asked her current physician to sign the necessary TPD certification but has not yet applied for a TPD Discharge. The Government's questioning and Hock's sworn statements related to her efforts regarding the TPD Discharge are detailed in her deposition testimony at Depo Tr. 61:19-80:2.

**C. Hock's income and expenses.**

37.    The Parties disagree as to the definition of "current income" as used in the 1st Prong of the *Brunner* Test, and whether Hock's "current monthly income" in the underlying bankruptcy case, as defined by Section 101(10A) of the Bankruptcy

---

[7] *See Total and Permanent Discharge (TPD) 101*, U.S. DEP'T OF EDUCATION, https://www.disabilitydischarge.com/TPD-101.

Code, is relevant to that determination.

38.    The Parties agree that the factual inputs for the income calculation are properly drawn from Hock's Schedules I and J (Bankr. No 18-31795, Doc. 26) and Hock's Interrogatory Responses (Doc. 19-1, Ex. 2).

39.    Hock receives social security benefits in the amount of $1,423 per month.

40.    Hock's husband receives a monthly Veteran's Disability Award ($3,292.22/monthly), monthly pension ($520.11/monthly) and Social Security Benefits ($1,747/monthly).

41.    Hock received tax refunds of $1,721 and $589 in 2018 and 2019, respectively.

42.    Hock's monthly expenses are set forth in Schedules I and J (Bankr. No 18-31795, Doc. 26), Hock's Response to Interrogatory No. 9 (Doc. No. 19-1, Ex. 2), her deposition testimony (Doc. No. 19-1, Ex. 4), and her mortgage statement (Doc. 19-1, Ex. 7).

## ISSUES PRESENTED

Has Hock demonstrated by a preponderance of the evidence that she meets each element of the applicable "*Brunner* Test,"[8] to wit that:

1. Hock cannot maintain, based on her current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans;
2. That additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and
3. Hock has made a good faith effort to repay the loans.

---

[8] *Brunner v. New York State Higher Educ. Servs. Corp.*, 46 B.R. 752, 756 (S.D.N.Y. 1985), aff'd, 831 F.2d 395 (2d Cir. 1987).

## DISCUSSION

Section 523(a)(8) states:

A discharge under section 727…of this title does not discharge an individual debtor from any debt—unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for:

A. (i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or

B. any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual.

## I.    Student Loan Debts Are Not Generally Dischargeable.

As the statute reflects, a debtor cannot normally discharge a student loan through a bankruptcy case. *Frushour v. Educ. Credit Mgmt. Corp.*, 433 F.3d 393, 396 (4th Cir. 2005). Congress made it difficult to discharge student loans in order to protect the integrity of the student loan program and in recognition of the bargain students receive when borrowing money to pursue an education. *Id*. at 399 ("Debtors receive valuable benefits from congressionally authorized loans, but Congress in turn requires loan recipients to repay them in all but the most dire circumstances."); *see also, Brunner*, 46 B.R. at 756 ("In return for giving aid to individuals who represent poor credit risks, it strips these individuals of the refuge of bankruptcy in all but extreme circumstances.").

"Since the decision of whether or not to borrow for a college education lies with the individual, it is the student, not the taxpayers, who must accept the consequences of the decision to borrow." *Pa. Higher Educ. Assistance Agency v. Faish*, 72 F.3d 298, 305 (3d Cir. 1995) (quoting *In re Robertson*, 999 F.2d 1132, 1137 (7th Cir. 1993)). In other words, when a student loan borrower accepts money from the government, he strikes a bargain, and "[l]ike all bargains,

it entails risk. It is for each student individually to decide whether the risks of future hardship

outweigh the potential benefits of a deferred-payment education." *Brunner*, 46 B.R. at 756.

## II.    The Fourth Circuit has adopted the *Brunner* test to determine undue hardship.

Given this, student loans are dischargeable in bankruptcy only where repayment of the

loans places an "undue hardship" upon the debtor. 11 U.S.C. § 523(a)(8). While the Bankruptcy

Code does not define "undue hardship," the Fourth Circuit has adopted the three-part *Brunner*

test to determine when such circumstances exist.[9]

Under the *Brunner* test, the debtor must prove:

(1) that the debtor cannot maintain, based on her current income and expenses, a
'minimal' standard of living for herself and her dependents if forced to repay the
loans;

(2) that additional circumstances exist indicating that this state of affairs is likely
to persist for a significant portion of the repayment period of the student loans

(3) that the debtor has made good faith efforts to repay the loans.

*Frushour,* 433 F.3d at 400.

The burden is on the debtor to demonstrate, by a preponderance of the evidence, that

each of the three prongs is satisfied. *Spence v. Educ. Credit Mgmt. Corp.*, 541 F. 3d 538, 543-

44 (4th Cir. 2008). If one of the prongs is not shown, the inquiry ends. The loan is not discharged.

*Id*.

Finally, and "[b]ecause Congress selected the word 'undue,' the required hardship under

§ 523(a)(8) must be more than the usual hardship that accompanies bankruptcy….

[D]ischargeability of student loans should be based on a 'certainty of hopelessness.'" *Frushour*,

433 F.3d at 401 (quoting *In re Brightful*, 267 F.3d 324, 328 (3d Cir. 2001)).

---

[9] *See Ekenasi v. Education Res. Inst. (In re Ekenasi),* 325 F.3d 541 (4th Cir.2003) (adopting the *Brunner* test in
Chapter 13 cases); *Frushour,* 433 F.3d 393 (adopting the *Brunner* test in Chapter 7 cases).

### A. Hock's Objections to *Brunner*.

As an initial matter, Hock complains that the *Brunner* test employs "retributive dicta" not found in Section 523(a)(8). She further opines that the *Brunner* test creates "too high a burden for most bankruptcy petitioners to meet"  and urges this Court to abandon *Brunner* in favor of a more debtor friendly test, specifically, the "disposable income test" of Sections 707(b)/1325(b) or the "discretionary income" measure found in the Government's student loan regulations. *See* Plaintiff's Motion for Summary Judgment, (Doc. No. 18 at p. 6); Debtor's Reply Brief, (Doc. No. 25 at p. 5-7, 9-10).

Hock's suggestion that the *Brunner* test is "dicta" is misplaced. *Brunner* was a student loan dischargeability action. The *Brunner* trial court employed objective factors to determine whether that debtor's circumstances met the statutorily mandated "undue hardship." Those factors were necessary to the holding in *Brunner*. They were criteria, but not dicta.

As Hock suggests, the *Brunner* test is an exacting standard. However, and as noted above, that was intentional. Congress meant for student loan debts to be discharged only in the most dire circumstances.

And since the *Brunner* test has been adopted by the Fourth Circuit (in *Frushour*) as the applicable standard by which to consider Section 523(a)(8) student loan dischargeability requests, it is also controlling law. This bankruptcy court is not at liberty to fashion another test. Hock's case must be considered under *Brunner*.

### B. First *Brunner* factor: Whether based on current income and expenses, Hock is unable to repay her student loan debt and maintain a minimal standard of living?

The first prong of the *Brunner* test requires Hock to prove that she cannot, based on current income and expenses, repay her student loans and maintain a minimal standard of living.

Hock maintains that the first prong is "mechanical" and is to be adjudged under the Chapter 13 definition of "current monthly income" adopted in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Section 1325(b)(2). According to Hock, "currently monthly income" and "disposable income" routinely measure what the first prong of Brunner does: a household's current ability to repay. Plaintiff's Reply Brief, (Doc. No. 25, p. 6).

Presuming that to be the standard, Hock next posits that she has income (social security benefits) of only $1,423 per month, "current monthly income" of only $520.11 per month under Section 101(10A), and thus no "disposable income" within the meaning of Section 1325(b).[10][11] Hock further suggests that her lack of "disposable income" moots any argument about the reasonableness of her living expenses. Alternatively, Hock argues that she lacks "Discretionary Income" under the applicable student loan regulations.

There are serious flaws in Hock's argument. The first is her misassumption that the "Disposable Income" test of Section 1325(b)(2) applies. Section 1325(b) is a Chapter 13 confirmation provision. This matter, however, is a Chapter 7 student loan dischargeability action under 11 USC 523(a)(8). Here, the question is, based on Hocks's current income and expenses, can she repay her student loan debts while maintaining a "minimal standard of living?" In answering that question, the "Disposable Income" concept of 11 USC § 1325(b)(2) (and 11 USC § 707(b)), the Dept. of Education's student loan guidelines, and the Internal Revenue Service's collection standards may aid the bankruptcy court, but none of them are determinative.[12]

---

[10] Hock's Schedule J (Bankr. No 18-31795, Doc. 26) reports monthly expenses of $8,637.60.

[11] Hock incorrectly states that this Court has held that the "current monthly income" for her household to be only $520.11 per month and her "projected disposable income" to be zero dollars. Plaintiff's Reply Brief, (Doc. No. 25, p. 5). However, there was no prior litigation in Hock's bankruptcy case, and no such ruling has been made. These are simply numbers which Hock self-reported in her petition.

[12] *See infra* fn. 19.

14

Section 1325 and the new "disposable income" standard do not, as Hock suggests, supplant the *Brunner* test. In 2005, Congress enacted BAPCPA to correct perceived abuses of the bankruptcy system. *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 231-232, 130 S.Ct. 1324, 1329, 176 L.Ed.2d 79 (2010). It was the sense of Congress that many people were unnecessarily filing Chapter 7 when they had an ability to repay their creditors. *See, e.g., In re Smurthwaite*, 149 B.R. 409, 411 (N.D.W. Va. 1992) (concerning a debtor in Chapter 7 who was abusing the bankruptcy process by seeking to take unfair advantage of his creditors when he had the ability to repay his debts). BAPCPA was intended to limit such endeavors through the use of a "Means Test" based upon IRS collection standards. The Means Test, inclusive of the newly defined "disposable income" term, was incorporated into Sections 707(b) and 1325(b)(2)(A), as was the new term, "current monthly income." *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, H.R. Rep. No. 109–31, pt. 1, p. 2 (2005).

BAPCPA made slight changes to Section 523(a)(8), but it did not change the undue hardship standard. Nor did it eschew reliance on *Brunner*. Brunner was decided in 1985 and had been adopted by most circuit courts long before BAPCPA was enacted. Yet there is nothing in the text nor the legislative history to BAPCPA suggesting Congress intended to replace *Brunner's* "minimal standard of living" test with the new "disposable income" test.

That is hardly surprising as these are different concepts employed in different situations. The Section 707 Means Test and its component term, "disposable income," determine which consumer bankruptcy debtors are minimally eligible for Chapter 7. Those who fail (either due to excessive income or expenses) must opt for another bankruptcy chapter, typically Chapter 13, or else eschew bankruptcy relief altogether. In short, the Means Test defines the pool of

Chapter 7 debtors. Meanwhile, for Chapter 13 debtors, Section 1325(b) determines how much they must devote to fund a plan.

By contrast, Section 523(a)(8) considers which few individuals out of the broad universe of bankruptcy debtors would face an "undue hardship" if forced to repay their student loans. Only this small subset—debtors facing the most dire circumstances—can discharge their student loans.

The Fourth Circuit has considered student loan dischargeability on three separate occasions since BAPCPA passed. *See Spence*, 541 F.3d 538 (4th Cir. 2008); *Educ. Credit Mgmt. Corp. v. Mosko*, 515 F.3d 319 (4th Cir. 2008); *Frushour*, 433 F.3d 393 (4th Cir. 2005). In each case, it has employed the *Brunner* Test without any suggestion that "current monthly income" under Section 1325(b) or "disposable income" under Sections 707(b) and 1325(b) were applicable.

In fact, *Frushour* refutes Hock's suggestion: "[b]ecause Congress selected the word 'undue,' the required hardship under § 523(a)(8) must be more than the usual hardship that accompanies bankruptcy. Certainly, the inability to pay one's debts by itself cannot be sufficient; otherwise all bankruptcy litigants would have undue hardship. The exception would swallow the rule, and Congress's restriction would be meaningless." *Frushour*, 433 F.3d at 399.

So too here. If Hock meets the first Brunner prong, then so do all Chapter 7 debtors, and no doubt, many Chapter 13 debtors. That is entirely contrary to Congress's stated intention.

The second problem with Hock's argument is that she is not consistent in how she determines her income and expenses, and thus her net income. When it comes to income, Hock only includes her individual income, $1,423.00 of Social Security Benefits. She ignores her husband's monthly income of $5,559. Hock says that including Mr. Hock's income in the

16

calculation would "stray wildly from the plain language of Section 523(a)(8)." Plaintiff's

Motion for Summary Judgment, (Doc. No.18, p. 7). Hock also suggests that this would be

improper because her husband is a disabled veteran and most of his income derives from

government disability benefits and social security.[13] *Id.*

However, it is well settled law that the income of non-debtor spouses must be counted

in Section 523(a)(8) cases under *Brunner. See, e.g., In re Augustin*, 588 B.R. 141, 150 (Bankr.

D. Md. 2018) (citing multiple cases).  And it is equally clear that all income sources (wage

income, social security, disability and pension benefits) are considered under *Brunner* for

Section 523(a)(8) purposes.[14]

Hock has also been inconsistent in reporting her expenses. While she counts only her

individual income in determining her "disposable income," Hock deducts all of her household's

expenses.[15] In short, she excludes Mr. Hock's income in the calculation but includes his

expenses. This artificially depresses the family's net income and portrays Hock's finances as

being substantially worse than they actually are.

Adjusting Hock's reported household income and expenses to meet the proper legal

standard and to reflect all income and expenses, Hock has a household income of $6,982.33 per

month or roughly $83,787.96 per year—for a family of two. The required student loan payments

on Hock's loan are approximately $1,680 as of February 2021. Thus, if Hock made monthly

payments on her student loans, she and her husband would be left with $5,302.33 per month or

[13] Mr. Hock receives $5,559 per month: Veteran's Disability Award of $3,292.22, a pension of $520.11 and Social
Security Benefits $1,747. Answer to Interrogatory 6, (Doc. No. 19-1, Ex. 2)
[14] Hock counts her Social Security benefits as personal income for present purposes, but if the test actually was
"disposable income" under Section 1325(b), such benefits would also be excluded. She would have no "disposable
income."
[15] In her base case, Hock properly reported her household income, then reported to be $6,673.78, subtracted
household expenses of 6,152.60 and ended with a positive net income of $521.18 per month, before the student loan
payment. (Bankr. No 18-31795, Doc. 1).

$63,627.96 per year to support themselves. *See* Joint Stipulation of Facts and Admissibility of Documents (Doc. No. 31 at ¶¶ 21, 37-38).  Obviously, this amount of income is sufficient for two people to maintain a 'minimal' standard of living in Western North Carolina.  Many residents of this State make do on less.

As the Government notes, given this level of income and benefitting from a discharge of her other debts, the only reason Hock cannot pay back her student loans is her desired lifestyle. *See Educ. Credit Mgmt. Corp. v. Nys*, 446 F.3d 938, 946 (9th Cir. 2006). A review of Hock's individual household expenses (collectively referred to as Hock's expenses) demonstrates that point.

Hock and her husband live in a four bedroom, two-and-a-half-bathroom house, with a deeded boat slip, adjacent to Lake Norman. The home was purchased for $375,000 in 2017. Altogether, the house and related expenses, cost Hock a minimum of $2,974.32 per month.  *See* Defendant's Motion for Summary Judgement (Doc. No. 19, p. 4). Significantly, the home was purchased after Hock (1) took out her student loans, (2) underwent thyroid surgery and cancer treatment, and (3) ceased working as a financial advisor at Merrill Lynch. *Id.* at 20.

Additionally, the Hock's drive two Lexus automobiles, at a monthly cost of $2,012 (lease payments, gas and registration $1,533.28; car insurance, $144 and monthly transportation costs of $335). *Id.* at 21. While Hock argues that her car and transportation costs themselves are considered reasonable under the Means Test and IRS standards for a household owning and operating two cars, as noted above, this is not the test. Moreover, Hock offers no explanation why owning and operating two luxury cars is necessary for her household to maintain a minimal standard of living, given that both persons are either retired or disabled.[16]  It is significant that

---

[16] Elsewhere, Hock argues that she is unable to work because her husband's disabled condition requires her to act as his full-time caretaker. *See, e.g.*, Plaintiff's Brief, (Doc. No. 33, p. 8). It is hard to fathom (and Hock does not

these vehicles were leased after Hock's medical conditions and unemployment occurred. *See Perkins v. Vermont Student Assistance Corp.,* 11 B.R. 160, 161 (Bankr. D. Vt. 1980) (buying a new car was a "self [-]imposed hardship").

Then there is entertainment. Hock enjoys a premium Direct TV package costing $259.56 per month, inclusive of add-ons ($50.99 for HBO, $4.99 for the movies extra pack, $25 for an advanced receiver, and $14 for a two-client subscription service). She also pays monthly for Netflix ($17.15), Sirius XM radio ($21.48) the New York Times ($4.29), and Disney Plus subscriptions ($7.50) (totaling $50.42). That is in addition to other like kind, entertainment expenses: for example, from June 10 to July 6, 2020, Hock and her husband made ten Amazon digital purchases, and twenty purchases from Amazon, Ebay, and Etsy from May 29 to June 26. (Doc No. 19-1, Ex. 10). Some level of entertainment is appropriate under *Brunner*, but here the monthly expenditures are excessive.

Additionally, the Hock's spend $1,000 per month on food for two people; $125 per month for pet care; a total cell phone bill of approximately $260 per month; and $78.30 per month plus undefined data charges for adult son Trevor Hock's phone line (Doc. No. 19-1, Ex. 8). In short, Hock's lifestyle is well beyond a "minimal standard of living." It is better described as an upper income standard, containing many nonessential, and even luxury, expenses.

The Government offered a relevant example of how Hock could rein in her household expenses so as to both live and provide for a $1,680 student loan payment. First, putting her monthly payments in support of her adult son and charitable contributions towards the loan would leave $1405 remaining. *See* Defendant's Motion for Summary Judgement (Doc. No. 19, p. 23). Then, by scaling down to one car for two people—who, by Hock's own account, rarely drive—

---

explain) how her husband could be so infirm as to require full time care but well enough to require his own automobile.

(a $766.64 reduction) would roughly halve her vehicle expense and would leave $638.36.[17]

Removing Trevor Hock's phone line ($78.30) and the premium entertainment

subscriptions/extras on top of the already premium package Hock has ($223.70) would leave

$414.66.3.[18] That $414.66 remaining could be readily found in Hock's $5,302.33 per month

household income after making the loan payment in a variety of ways. Less Amazon purchases,

the reduction of an unlimited cell phone plan for herself and her husband, and reduction of her

premium cable/internet package might likely do that by themselves.

And if not, Hock could easily do it by moving her family of two from their four-bedroom

home in a lake-access neighborhood into more affordable housing. *See Miller v. Sallie Mae, Inc.*,

409 B.R. 299, 320–21 (Bankr. E.D. Pa. 2009) ("As stated, the heart of Sallie Mae's argument

concerning the Debtor's Home is that the Debtor has not offered evidence to establish (or at least

create a disputed issue of material fact) why she needs this house, with its attendant level of debt

service, in order to maintain a minimal standard of living. I agree."). Indeed, she would only have

to reduce her monthly home costs from $2,974.32 to $2,559.66 (assuming the other reductions

above) when doing so.

Hock's reference to the IRS standards (Doc. 33 at 5-6) proves the point.[19] Hock takes the

---

[17] *See Educ. Credit Mgmt. Corp. v. Waterhouse, 333 B.R. 103*, 111 (W.D.N.C. 2005) ("While it may be a hardship
for Appellee to reduce some expenses (such as the telephone bill) or trade his truck for a more affordable vehicle (or
simply maintain one vehicle in the household) to allow for repayment of his voluntarily incurred student loan debt, it
is not an undue hardship."); *In re Henry*, No. 14-70113, 2016 WL 3681201, at *6 (Bankr. C.D. Ill. July 5, 2016)
(finding, inter alia, expenses for multiple vehicles as a factor that debtor's financial problems were of her own
making and she had not made accounting for data cost reduction).

[18] *See Russotto v. Educ. Credit Mgmt. Corp.*, 370 B.R. 853, 857–58 (Bankr. S.D. Fla. 2007) ("Debtor's $130.00 a
month cable and internet bill includes upgraded services like digital cable, high-speed internet, and multiple screens
of the premium channel HBO. The Court agrees that the minimal standard of living under Brunner should provide
some room for life's small indulgences, like cable television or internet access, but the Court finds that the Debtor
could maintain these niceties through a much more economical cable and internet package."). ("[T]he debtor cannot
purposely choose to live a lifestyle that prevents her from repaying her student loans."); *see also United States v.
Cavera*, 550 F.3d 180, 205 (2d Cir. 2008) (noting that "the factfinder—whether judge or jury—[may] draw on
common sense and experience in making any determination.").

[19] *In re Miller* contains a salient and well-reasoned discussion of the IRS standards utility as simply one piece of
evidence and a reference point under the *Brunner* analysis. 409 B.R. at 320. ("These conclusions concerning means

IRS standard's Mecklenburg County housing number of $1,758 and compares it only to her mortgage payment of $1,872.32—to imply her housing costs are only slightly above average. *But cf.* (Doc. 19-1 at 95) (mortgage statement indicating payment of $2,337.16 per month). However, the IRS standards contemplate far more than just a mortgage payment. They include mortgage or rent, property taxes, interest, insurance, maintenance, repairs, gas, electric, water, heating oil, garbage collection, residential telephone service, cell phone service, cable television, and Internet service.[20] An apples to apples comparison—i.e. comparing these standards to Hock's total housing related costs (minimum $2,974.32), as well as her monthly cell phone and cable TV/internet bills ($257.88 and $259.56 respectively), (totaling $3491.76), reveals that Hock spends $1,733.76 over the IRS standards in this category alone—enough to completely cover her expected $1,680 monthly loan payment when her loans come out of deferment. *See* (Doc. 19-1 at 114-24). The Government concludes that Hock can in fact pay her student loans and maintain a minimal standard of living.[21]

We might quibble about a couple of relatively minor expenditures, but this Court agrees with the overall argument. Hock is subsisting well above the *Brunner* "minimal" standard.[22] That

---

testing lead back to the starting point of this discussion. The IRS expense standards (and means testing methodology) may be helpful in providing the court with a frame of reference for evaluating the debtor's expenses, but they cannot be determinative on the question whether the debtor's is living at, below or above a minimal standard of living. As one court has stated, in § 523(a)(8) proceedings, the court must apply its commonsense knowledge gained from ordinary observations in daily life and general experience to determine whether the debtor's expenses are reasonable and necessary to maintaining a minimal standard of living.") (internal citations and alterations omitted).

[20] *North Carolina—Local Standards: Housing and Utilities*, INTERNAL REVENUE SERVICE, https://www.irs.gov/businesses/small-businesses-self-employed/north-carolina-local-standards-housing-and-utilities.

[21] Hock lives on the edge of Mecklenburg County near Iredell, Catawba, and Lincoln Counties (i.e. the four counties bordering Lake Norman). Mecklenburg County's housing and living costs are driven up by the Charlotte metropolitan area—in which neither Hock nor her husband work and live a good distance from. Hock's failure to minimize expenses is further demonstrated by the fact that she, having no reason to stay in Mecklenburg County, would not avail herself to the lower cost of living in one of these neighboring counties, as shown by the comparative IRS standards ($1,601, $1,377, and $1,498 respectively).

[22] Here, Hock's failure to minimize expenses is actually fatal to her case under all three *Brunner* prongs: (1) only without minimization can her expenses exceed her  significant household income under the first prong, (2) minimization of expenses would show that  her current state of affairs is not likely to persist over the life of her loans—since the Hock's current household income is not dependent on Hock working, and it is her spending, rather

"minimal standard of living" does not require a debtor to live in squalor. However, it also does not allow a debtor to live "above his means" and then obtain a discharge of his student loan debt by merely showing that his expenses consume virtually all of his income. *In re Waterhouse*, 333 B.R. at 111 (internal citations omitted).

Hock fails to meet the first Brunner factor.

### C. Second *Brunner* factor: Additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans.

Hock argues that she meets the second *Brunner* factor because she is 70, has been unemployed for three years, is a cancer survivor whose surgery interrupted her working career, and is the caregiver for a disabled husband. Hock contends that she is unlikely to overcome her medical condition, has no reasonable prospects for future employment, and is unlikely to ever work again. Thus, she will be forced to subsist off her social security benefits and her husband's Veteran's Disability Benefits. Hock concludes that she will be unable to repay a significant portion of her student loan debt during the next 25 years. Hock cannot meet her burden under the second *Brunner* factor either: she cannot show a state of affairs under which she cannot maintain a minimal standard of living is likely to persist for the life of her loans.

The second *Brunner* factor is "prospective in nature and looks for exceptional circumstances beyond the debtor's current situation," is "the heart of the *Brunner* test," and is a "demanding requirement" which will only be found in "rare circumstances." *Frushour*, 433 F.3d at 401. It is only satisfied if a plaintiff can demonstrate that additional circumstances exist indicating that her state of affairs is likely to persist for a significant portion of the repayment

---

than any health condition, that has the greatest impact on her ability to pay in the future under the second prong. *See In re Perez,* No. 16-28473-B-7, 2018 WL 1037408, at *7 (Bankr. E.D. Cal. Feb. 20, 2018) and (3) under the third prong, her lack of any effort to minimize expenses bears directly on her good faith efforts to repay her loans. However, out of an abundance of caution, we will consider the remaining two elements.

period of the student's loans. For example, in *Spence*, the debtor was in her late 60's, suffered from diabetes and high-blood pressure, had a low paying job, and met the requirements of the first prong of the *Brunner* test. 541 F.3d at 544. The Fourth Circuit nevertheless held that she did not have the "rare circumstances" necessary to obtain a discharge. *Id*.

On this record, it is far from clear whether Hock will be able to work going forward. Certainly, she has experienced serious health events. But Hock is now cancer free, and by her own admission, the side effects from her thyroid replacement medication are "minor, the effects of her hypercalcemia are improving, and she is currently able to maintain focus until 2:00 pm in the afternoon. Add to that her extensive education, work history, and the fact that the jobs for which Hock is qualified do not require physical labor. On this record, we can neither conclude that Hock will be able to improve her income prospects over the remainder of the repayment period for her loans, nor can we gainsay it. *See, e.g.*, *Thomas v. Dep't of Educ.*, 931 F.3d 449, 452 (5th Cir. 2019) (holding that an unemployed 62-year-old debtor with diabetic neuropathy was capable of employment in sedentary work environments, creating income, and failed *Brunner*'s second prong).

Importantly, Hock cannot rely on her age alone or the fact that she obtained the loans late in life as an additional circumstance.[23] *See Spence*, 541 F. 3d at 544 (stating as to a debtor in her late 60's: "We are not unsympathetic to the disadvantages of her current circumstances, but the facts point to no 'additional circumstances,' outside of the normal hardships faced by bankruptcy petitioners, that would render her situation hopeless."). Hock was fully aware of her age when she took out the loans (Doc 19-1, Ex. 4, Dep. 19:15-20:6), but choose to defer them while her son

---

[23] Indeed, Hock appears to blame the DOE for approving her loan based on her age—despite the fact that she herself was a Merrill Lynch financial advisor when she applied for and received the loan. (Answer to Interrogatory No. 1, Ex. 2, at p. 2-3).

spent over six years enrolled in school. *See Little v. U.S. Dep't of Educ.*, 607 B.R. 853, 861 (Bankr.

N.D. Tex. 2019) ("The Littles chose to go to school later in life; the repayment of debts will thus

last into their later years. Age also does not prevent the Littles from collecting pension payments;

instead, their monthly income should increase upon turning 65. There is no indication from the

record that the Littles have an additional circumstance that would make them unable to pay

*anything* on their student loan debt in the coming years.") (emphasis in original and internal

citations omitted).

Here, neither age nor health prevents Hock from having a <u>current</u> household income of

$6,982.33. Hock's household income is entirely derived from social security, disability and

pension income. These revenues will continue irrespective of Hock's ability to work. Since Hock

presently has the present ability to pay her loans and maintain a minimal standard of living, and

since that income will continue to be available to her irrespective of her ability to work, Hock

fails the second *Brunner* prong.

### D. Third Brunner factor: Has the debtor has made good faith efforts to repay the loans.

The third *Brunner* factor requires good faith efforts to repay the student loans. These

consist of the debtor's "efforts to obtain employment, maximize income, and minimize

expenses." *In re Mosko*, 515 F.3d at 324 (quoting *O'Hearn v. Educ. Credit Mgmt. Corp.*, 339

F.3d 559, 564 (7th Cir. 2003)). Furthermore, a debtor may not "willfully or negligently cause his

own default, but rather his condition must result from factors beyond his reasonable control." *Id*.

Finally, the debtor must seriously pursue loan consolidation options. *See Frushour*, 433 F.3d at

402.

Hock says she has demonstrated "good faith" by complying with all contractual

obligations of her master promissory note with the Government and by keeping her student loans

current and in good standing. Hock maintains that cancer, and the resulting hypercalcemia caused her to lose her job, plague her recovery, and eliminate her ability to continue making payments under a standard ten-year amortization. She suggests her loans are ineligible for income-contingent repayment, or any other income-based repayment plan, while in deferment as her son remains in school—even though Hock admits that deferment will likely end this year.  Finally, Hock considers income-contingent repayment to be untenable as this would require:  (1) a direct consolidation loan, (2) contributing 20% of her "disposable income" as monthly payment until she is 94, (3) recertifying her income to the federal government annually, and (4) paying income tax on the forgiven portion of the debt, which she estimates to be $572,015.08 in 2045.[24]

But, these assertions of good faith are belied by the fact that Hock has (1) only made two payments on her loans, (2) failed to seriously pursue loan consolidation or income-based repayment options, (3) failed to pursue an  administrative disability discharge that could be available to her, and (4) failed to make even minimal efforts to minimize her expenses. We consider these in turn.

1. Instead of making payments on her loans, Hock requested deferments for the life of the loans based on her son's enrollment in school such that she has only had to make two payments since 2014.

"In determining whether a debtor has made a good faith effort to repay a student loan obligation, a primary consideration is whether the debtor actually made any payment on the obligation, and if so, the total amount of the payments." *Hall v. U.S. Dep't of Educ.,* 293 B.R. 731, 737 (Bankr.N.D.Ohio 2002) (citing *Green v. Sallie Mae Serv'g Corp.*, 238 B.R. 727, 736 (Bankr. N.D.Ohio 1999)); *see also Spence*, 541 F.3d 538, 545 (4th Cir. 2008) ("[P]laintiff made efforts to obtain available deferments and forbearances, but after they expired, she immediately

---

[24] Based upon the Government's proof of claim of $133,278, and inclusive of 6.05% interest over 25 years. *See* Base Case Claims Register, Claim #3.

filed for bankruptcy and has not made one payment on any of the loans held by ECMC. Obtaining the deferment of student loans is not sufficient to demonstrate a good faith effort to repay them when the deferment is followed by not one payment or any effort to work out a reasonable payment schedule.").

Hock's payment history is not reflective of a good faith effort to repay—since the inception of these loans, she has only made two payments of $2,774.52, against an outstanding balance of $143,581.48. (Complaint at ¶ 21 and Ex. 1 at ¶ 12). From February 2014 until June 2017, Hock was making roughly $4,500 per month as a financial advisor at Merrill Lynch (in addition to her husband's income). Answer to Interrogatory No. 6, (Doc. No. 19-1, Ex. 2 at p. 6). She could have made monthly loan payments then, but instead, sought a deferment based on her son being enrolled in school.

Notably, unlike a student in school taking out education loans—who is presumed to be receiving an education as opposed to working when the loans are disbursed—Hock was employed and did not need to seek a deferment. Indeed, deferment of Parent Plus loans is not automatic while the student is in school: the parent must apply for deferment.[25] Hock did so on this basis— and only paid during the short window the loans were not in deferment. (Doc. No. 19-1, Ex. 1 at ¶ 14). Thus, Hock's payment history does not support a good faith effort to repay the loans.[26]

2. <u>Hock's failure to complete an application for a loan repayment plan belies any assertion of good faith efforts to repay her student loans.</u>

Hock has not seriously pursued loan consolidation options or an income-based repayment plan that would lower her monthly payments—which the Government indicates she is eligible

---

[25] *See, e.g.*, *Payment Plus Borrower Deferment Request*, U.S. DEPT. OF EDUCATION, https://studentaid.gov/sites/default/files/ParentPLUSBorrowerDeferment.pdf.
[26] While it is true the DOE granted her deferment request, that fact is irrelevant to the issue of whether Hock herself made a good faith effort to repay the loans.

for and based on her 2019 income, would be **<u>zero dollars</u>**.

A debtor's attempt (or lack thereof) to explore loan consolidation options or obtain an administrative discharge is considered under the due hardship analysis of § 523(a)(8). *See Frushour*, 433 F.3d at 402 (citing *Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete)*, 412 F.3d 1200, 1206 (10th Cir. 2005)). "Although not always dispositive, it illustrates that the debtor takes her loan obligations seriously and is doing her utmost to repay them despite her unfortunate circumstances." *Id.* (emphasis added) (citing *Tirch v. Penn. Higher Educ. Assistance,* 409 F.3d 677, 680, 682-83 (6th Cir. 2005)).

Had Hock consolidated her loans, she would be eligible to participate in the Income-Contingent Repayment ("ICR") plan. (Doc. No. 19-1, Ex. 1 at ¶ 15). And if she did so, based on the total amount of her loans, her family size, and the adjusted gross income from her tax returns,[27] her ICR payment would be zero dollars per month. *Id*. Further, if she consolidated, she would still maintain her eligibility for any deferment, forbearance, discharge, or forgiveness options currently available. *Id*. at ¶ 17.

Hock admits she has not applied for ICR. (Doc. No. 19-1, Ex. 2, p. 20). In her responses to the Government's Requests for Admissions, she claims she researched the ICR program and "made the substantive decision that the program did not work well for her circumstances." *Id*. Her deposition testimony reveals that this research was, in her own words, "just minor" and it would have been "a Google search probably, if anything" (Doc. No. 19-1, Ex. 4, Dep. 60:20-61:18), and that rather than seeking consolidation of her loans, she merely pursued discharge here. (Doc. No. 19-1, Ex. 4, Dep. 60:25-61:11, "Q. … And I believe I would have to go through refinancing the loan out of a Parent PLUS loan, combining the two or something like that before I

---

[27] *See, e.g.*, *Definition of Adjusted Gross Income*, INTERNAL REVENUE SERVICE, https://www.irs.gov/e-file-providers/definition-of-adjusted-gross-income

could even do it, and then it takes it out of the deferral. And I don't – and inasmuch as I was in the bankruptcy case, circumstances are what they are that I would do this. Q. And by 'this,' you mean sue in an adversary proceeding for forgiveness of your Parent PLUS loans? A. Correct.").

Hock suggests in her brief that she is not required to 'take out additional loans' as a precondition to obtaining a discharge of her student loan debts. True. However, in this Circuit, as most, the fact that the debt Hock has failed to consolidate her loans and seek ICR or other like options is an important component of the good faith inquiry. *Mosko*, 515 F.3d at 326 ("We have stated that seeking out loan consolidation options is 'an important component of the good-faith inquiry' because such efforts demonstrate that the debtors take their debts seriously and are doing their utmost to repay them despite their unfortunate circumstances."); *Frushour* 433 F.3d at 402 ("The debtor's effort to seek out loan consolidation options that make the debt less onerous is an important component of the good-faith inquiry.").

For example, in *Frushour*, the Fourth Circuit held that the debtor failed to establish good faith efforts to repay his loans where the debtor refused to "seriously consider the income contingent plan under the William D. Ford Direct Loan Program" and "refuse[d] to take [this] simple step that would have allowed him to fulfill his commitments in a manageable way." 433 F.3d at 403.

Hock has likewise failed to consider ICR or take the simple steps that could—at present—reduce her monthly payment to zero. She cannot, therefore, be credited with good faith efforts.[28]

---

[28] *See further In re Augustin*, 588 B.R. at 154 ("The record shows that Mr. Augustin is not willing to accept a manageable repayment plan that would permit him to manage the repayment of his student loans. This shows a lack of good faith on his part."); *In re Tirch*, 409 F.3d at 683 ("Because Tirch declined to take advantage of an ICR that would have been advantageous, he failed to sustain the heavy burden of proving that he made a good faith effort to repay his loans."); *In re Alderete*, 412 F.3d at 1206 (plaintiff's failure to consider alternate repayment options prior to filing for bankruptcy contributed to a finding of lack of good faith); *Roth v. Educ. Credit Mgmt. Corp. (In re Roth)*, 490 B.R. 908, 919 (9th Cir. BAP 2013) (noting that a debtor's refusal to enroll in an Income-Based

3. <u>Hock's failure to pursue a disability discharge further undercuts any assertion of good faith efforts.</u>

Likewise, Hock has failed to seek a total and permanent disability ("TPD") discharge despite the fact that this case was continued for an entire year so that she could do so. (Docs. 11 and 15; Ex. 2, p. 20, RFA No. 2 Answer). The Government has not suggested that Hock must pursue an administrative discharge prior to seeking relief from this Court. *See, e.g., Lagueux v. Dep't of Educ.*, 604 B.R. 249, 251 (Bankr. D.S.C. 2019) ("A debtor may be entitled to a discharge of his student loans under § 523(a)(8) without qualifying for a total and permanent disability administrative discharge, and vice versa.") (citing *Cagle v. Educ. Credit Mgmt. Corp.*, 462 B.R. 829, 831 (Bankr. D. Kan. 2011)). However, the fact that Hock has not done so is relevant to the good faith inquiry:

> A debtor's disability and his attempt (or lack thereof) to obtain an administrative discharge may be considered in an undue hardship analysis under § 523(a)(8). The good faith requirement is sufficiently malleable to cover a wide array of conditions. For example, the bankruptcy court may determine the debtor lacks a good faith attempt to repay the loan when administrative remedies are available to him but are not pursued. Likewise, where a debtor requests an administrative discharge before filing bankruptcy, the court may require the debtor to complete, or exhaust, the administrative process before making a § 523(a)(8) determination.

*Cagle*, 462 B.R. at 832.

This is especially true here. If Hock's prognosis and the allegations in her Complaint are correct, she would appear eligible for the TPD discharge. *Compare* Compl. ¶ 10 ("Hock's medical condition renders her unemployable now and for the rest of her life.") *with* Exhibit 5, TPD Discharge Application, Section 4 (physician's certification that applicant has a "medically

---

Repayment Plan cannot be "discount[ed]" and has "often tipped the good faith balance against a debtor"); *Russ v. Tex. Guaranteed Student Loan Corp.*, 365 B.R. 640, 646 (Bankr. N.D. Tex. 2007) ("the failure to attempt to renegotiate the terms of the student loan or to participate in an ICR supports a finding of a lack of good faith"); *In re Thomas*, 257 B.R. at 150 (denying student loan discharge at least in part due to debtor's failure to avail himself of payment options).

determinable physical or mental impairment that prevents the applicant from engaging in any substantial gainful activity.").

Yet the only efforts Hock made to apply for the TPD Discharge—in the year this case was continued for her to do so—was to see her primary care physician **once** during a separately scheduled visit, to bring the discharge form with her, and to ask her primary care doctor to complete it. (Doc. No. 19-1, Ex. 4, Dep. 62:5-73:13). At that single visit, her primary care physician was unwilling to fill out the certification under penalty of perjury (but importantly, did not tell Hock it was her medical opinion that Hock could not meet the criteria for the TPD discharge). Hock did not attempt to see any other doctors regarding the TPD discharge. (Doc. No. 19-1, Ex. 4, Dep. 74:24-78:14).

Hock's single visit to one doctor who was unwilling to sign a form under penalty of perjury does not constitute a good faith effort to avail herself of that available administrative discharge.

4. Hock's failure to minimize expenses is inconsistent with a good faith effort to repay her loans.

As discussed in regard to the first *Brunner* element, a comparison of Hock's household income to her alleged expenses demonstrates that Hock's inability to pay her student loan debt is due to her desire to maintain her well above average lifestyle. *See Mosko*, 515 F.3d at 326 (finding lack of good faith in instances where flagrant spending suggests that "their own negligence contributed to their current financial situation"). We need not rehash those conclusions here. Suffice it to say that even though neither currently works, Hock and her husband have a monthly household income of $6,982.33 or roughly $83,787.96 per year. That is almost five times the current poverty level of $17,240 for a household of two.[29]

---

[29] *Official USDA Food Plans: Cost of Food at Home at Four Levels,*

Hock fails the third prong of the *Brunner* test. She has failed to make more than minimal efforts to pay down her student debt; failed to actively pursue and complete an IRC application, the only repayment plan for which she is currently eligible; failed to actively pursue and complete a TPD discharge application outside of one doctor's visit; and failed to minimize her expenses. These facts, taken as a whole, show that Hock has not acted in good faith to repay her student loans.

## CONCLUSION

To discharge her student loan debt under Section 523(a)(8), Hock was required to demonstrate by a preponderance of the evidence, an "undue hardship" by establishing each of three factors articulated in *Brunner*, and as adopted by this Circuit in *Frushour*. Specifically, Hock was required to demonstrate that: (1) she cannot maintain based on current income and expenses, a minimal standard of living if forced to repay the loan; (2) additional circumstances exist indicating that the state of affairs is likely to persist for a significant portion of the repayment period of the student loan; and (3) she has made good faith efforts to repay the loans. Hock has failed to demonstrate any of the three factors, and her action fails.

The evidence drawn from Hock's filed pleadings, discovery responses, deposition, stipulated facts and admitted documents demonstrates that she cannot carry her burden under any of the three prongs. For the foregoing reasons, this Court finds in favor of the Government. Hock's student loan debt is nondischargeable and survives this bankruptcy case.

**SO ORDERED.**

This Order has been signed                                      United States Bankruptcy Court
electronically. The Judge's
signature and Court's seal
appear at the top of the Order.

---

*U.S. Average, July 2020*, UNITED STATES DEPARTMENT OF AGRICULTURE, https://www.fns.usda.gov/cnpp/usda-food-plans-cost-food-reports-monthly-reports.